GORDON T. YAMADA, ET AL.

V.

MICHAEL R. MCLEOD, ET AL.

Record No. 911120

April 17, 1992

Present: All the Justices

*William T. Freyvogel (Adams, Porter & Radigan*, on briefs), for appellants.
*William R. Marshall, Jr. (Taylor, Hazen & Kauffman*, on brief), for appellees.

JUSTICE WHITING delivered the opinion of the Court.

Here, we consider whether the trial court correctly required real estate purchasers to specifically perform their contract. We must decide: (1) whether the sellers had good and marketable title to the property; (2) whether the opinion of the purchaser's attorney to the contrary was sufficient justification for their refusal to close without an alleged defect being cured; and (3) whether specific performance was the proper remedy under the circumstances.

Upon Helen Mae Posey's death on November 12, 1988, a house and two lots, known as 2012 South Arlington Ridge Road in Arlington County (the property), passed as part of her residuary estate. Mrs. Posey's will provided in pertinent part:

> *THIRD*: I give, devise and bequeath all the rest and remainder of my property and estate, of whatever nature and wherever situated, subject to the powers hereafter given to

my Executor, to my daughters, MARIANNE HELEN POSEY, MAYME D. HURDLE and JACKELYN P. SHERMAN, share and share alike, *per stirpes*, in fee simple and absolutely.

*FOURTH*: I nominate and appoint my daughters, MARIANNE HELEN POSEY, MAYME D. HURDLE and JACKELYN P. SHERMAN, or the survivor or survivors of them, to be Executors of this my will. . . . During such time as there shall be three (3) Executors acting hereunder, any action or decision of the majority of the Executors shall be as effective as if taken or made by all of the Executors. . . .

I grant unto my Executor . . . the full power and authority to sell, encumber, exchange, lease or rent, any real property which I may own at the time of my death, at such price and upon such terms and conditions as my Executor in his sole discretion may determine; and to that end, my Executor may execute, acknowledge, and deliver any and all necessary or appropriate contracts, deeds, leases, agreements, notes, mortgages or deeds of trust, or any other necessary or appropriate instrument for the effective sale, encumbrance, lease, rental or conveyance thereof, and no purchaser, tenant, lender or other person dealing with my Executor shall be required to see to the proper application of any funds, property, money or proceeds thereof.

On November 29, 1988, Mrs. Posey's three daughters presented her will for probate and qualified as executors of her estate. On August 7, 1989, the three daughters, in their capacity as executors, executed and delivered a deed that purported to convey the property to J. Lawrence Hirsch, Howard Rooks, and Michael R. McLeod.

On August 22, 1989, Gordon T. Yamada and Kiyo Yamada (the Yamadas) signed a contract to purchase the property from Hirsch, Rooks, and McLeod (the sellers) for $865,000. Paragraph 7 of the contract provided:

SETTLEMENT DATE. TIME IS OF THE ESSENCE. The SELLER and PURCHASER agree to make full settlement in accordance with the terms hereof on, or with mutual

consent, before the 22nd day of September, 1989. If a longer time is required to secure a report of the title and a survey, or to finance [or] process the loan, if applied for in accordance with this Contract, then the date of settlement shall be extended for sufficient time to effect these conditions.

Paragraph 21 of the contract provided in pertinent part:

Title is to be good and marketable . . . otherwise the deposit is to be returned and Contract voided at the option of the PURCHASER, unless the defects are of such character that they may be remedied by legal action within a reasonable time, but the SELLER and AGENT are hereby expressly relieved from all liability for damages by reason of any defect in the title in case legal steps are necessary to perfect the title, such action must be taken promptly by the SELLER at his own expense, whereupon the time herein specified for full settlement by the PURCHASER will be extended as specified in Paragraph 7 hereof.

The Yamadas employed an experienced real estate attorney to have the title examined and to give a title opinion. Approximately a week before the September 22 closing, one of the real estate agents advised the Yamadas of the attorney's opinion that the August 7, 1989 executors' deed did not convey good title because the three daughters were residuary beneficiaries as well as executors of their mother's will. The attorney's opinion was that the daughters, in their individual capacities, and their spouses should have joined as grantors in the deed to the sellers.

However, the attorney advised the Yamadas of his belief that a "corrective deed" could be secured from the daughters and their spouses. Accordingly, the sellers and the Yamadas signed a 30-day extension agreement that extended the closing date to October 22, 1989.

During the 30-day extension period, the executors' attorney and the sellers' title company told the Yamadas' attorney that they did not agree with his opinion. Further, the executors' attorney advised the Yamadas' attorney that at least one of the three daughters and her husband would not sign his proposed corrective deed.

In order to close the matter, and despite its belief that the Yamadas' attorney was in error, the sellers' title insurance company attempted to secure a corrective deed. However, the attorney

for the title company told the Yamadas' attorney that if the corrective deed was not signed, he would file a suit for the sellers in which they would claim that their title was good and marketable and, therefore, would seek to have the Yamadas specifically perform their contract.

When it appeared that the sellers would be unable to secure the required signatures within the 30-day extension period, the Yamadas requested that they be released from the contract. In refusing to grant such a release, the sellers advised the Yamadas that the sellers would enforce the contract and were taking "every action that [they] could to remove any alleged cloud on the title." On October 25, 1989, the Yamadas contracted to purchase another residence despite the sellers' threatened enforcement of their contract.

On November 7, 1989, the sellers filed this multi-count specific performance suit against the Yamadas, the Posey daughters, and their husbands. In one count, the sellers sought to compel the Yamadas to purchase the property if the sellers' title was good and marketable. In alternative counts, the sellers sought specific performance from the remaining defendants of any necessary action to cure the alleged title defect if the title was found not good and marketable; failing that relief, the sellers asked for damages from the three daughters for breach of contract.

On February 26, 1990, the sellers settled their claims against the three daughters individually, the executors, and their husbands by payment of $7,000 in exchange for a corrective deed. Whereupon, the sellers dismissed their claims against those parties and the suit went to trial solely upon the sellers' claims against the Yamadas.

Upon completion of *ore tenus* hearings, the trial court held that the sellers' title was good and marketable. The court then decreed that the Yamadas specifically perform their contract of purchase and ordered that they pay certain of the sellers' delay damages that resulted from the Yamadas' refusal to close. The Yamadas appeal.

■ In accordance with well-settled appellate principles, we have stated the facts in the light most favorable to the sellers, the parties who prevailed in the trial court. And, because the trial court heard the evidence *ore tenus*, we are bound by its findings of fact, unless plainly wrong or without evidence to support them. Code

§ 8.01-680; *Giannotti v. Hamway*, 239 Va. 14, 23, 387 S.E.2d 725, 730 (1990).

■ The Yamadas correctly recognize that "[t]he executors have the *power* of sale under the will." (Emphasis added.) This power is a so-called "naked" power of sale. *Stark v. Norfolk*, 183 Va. 282, 288, 32 S.E.2d 59, 61 (1944). Upon execution of the naked power of sale by the executors, title to the land is "divested" from the devisees. *Id.*; *Coles v. Jamerson*, 112 Va. 311, 316, 71 S.E. 618, 619-20 (1911).

■ "Divest" is defined in pertinent part as "to take away (possessions or vested rights)." Webster's Third New International Dictionary 663 (1986). Another dictionary defines the equivalent word "devest" as "[t]o deprive or dispossess of a title or right (*e.g.* of an estate)." Black's Law Dictionary 452 (6th ed. 1990). The execution of the naked power of sale in the executors' deed clearly "took away" or "dispossessed" the daughters of whatever vested rights they had in the property. *Coles* at 316-17, 71 S.E. at 620.

Because the daughters' title was divested *during* their lifetimes, they no longer had interests in the property to which their husbands' derivative curtesy interests could attach. George L. Haskins, *The Defeasibility of Dower*, 98 U. Pa. L. Rev. 826, 833 (1950); *compare* L.C. Warden, Annotation, *Dower or curtesy in estates of inheritance subject to condition, defeasance, termination, or expiration*, 25 A.L.R.2d 333, 336, 351-52 (1952) (no dower or curtesy in spouse's fee simple defeasible estate subject to condition subsequent when terminating condition occurred *during* spouse's lifetime) with *Snidow v. Snidow*, 192 Va. 60, 64-65, 63 S.E.2d 620, 623 (1951) (contrary ruling when terminating condition occurred *upon spouse's death*).*

■ Accordingly, we hold that the executors' August 7, 1989 deed effectively divested the daughters, as devisees, and their husbands of any interest in the property and conveyed good and marketable title to the sellers.

Next, we consider whether their attorney's erroneous opinion justified the Yamadas' refusal to close the transaction in October 1989. In support of their position, the Yamadas cite *Madbeth, Inc. v. Weade*, 204 Va. 199, 129 S.E.2d 667 (1963), in which we said that:

---

* Dower and curtesy have been abolished as to those interests that were not vested prior to January 1, 1991. Code § 64.1-19.2.

> A marketable title is one which is free from liens and encumbrances; one which discloses no serious defects and is dependent for its validity upon no doubtful questions of law or fact; one which will not expose the purchaser to the hazard of litigation or embarrass him in the peaceable enjoyment of the land; one which a reasonably well-informed and prudent person, acting upon business principles and with full knowledge of the facts and their legal significance, would be willing to accept, with the assurance that he, in turn, could sell or mortgage the property at its fair value.

*Id.* at 202, 129 S.E.2d at 669-70.

■ In *Madbeth*, however, the evidence disclosed that inadequate record descriptions of the property required a survey and that litigation with other parties was required to resolve those and other title problems. *Id.* at 203, 129 S.E.2d at 670. Here, the sellers' title was clearly good and marketable, and their attorney's contrary opinion could not excuse the Yamadas' refusal to close. *Lyle* v. *Andrews*, 217 Va. 192, 194, 227 S.E.2d 686, 688 (1976) (statute cured alleged title defect).

Finally, we consider whether the trial court abused its discretion in requiring specific performance. The Yamadas argue that the relief granted should have been limited to a damage award rather than specific performance.

In support, they proffer the following quotation from *Porter* v. *Shaffer*, 147 Va. 921, 934, 133 S.E. 614, 617 (1926) (quoting *Wright* v. *Pucket*, 63 Va. (22 Gratt.) 370, 377 (1872)): "Wherever damages will answer the purpose of indemnity, this alternative will be preferred, as it will equally satisfy justice, and will be coincident with the provisions and in support of the authority of the statute [of frauds]." However, that statement was made in deciding whether to award specific performance or the reasonable value of part performance of partially performed *oral* contracts for the acquisition of interests in real estate. The statute of frauds is not involved in the present case; the written contract fully satisfies its mandate.

And, in *Allen* v. *Lindstrom*, 237 Va. 489, 497, 379 S.E.2d 450, 455 (1989), in requiring a *seller* to specifically perform his written contract to sell real estate, we noted that "[al]though the granting of specific performance is discretionary and not an absolute right, if the [real estate] contract sought to be enforced is proved and is

in its nature and circumstances unobjectionable, a court of equity should decree specific performance as a matter of course."

Similarly, in *Ayres* v. *Robins*, 71 Va. (30 Gratt.) 105, 115-16 (1878), we required a real estate *purchaser* to perform his written contract of purchase for two reasons: first, to give the seller the complete relief of a vendor's lien which otherwise would not be recognized in a court of law; and, second, to comply with the principle of mutuality that compels courts of equity to give the real estate purchaser the same relief as that afforded the seller. *Id.* at 116. We have also justified a requirement of specific performance by both the seller and the purchaser of real estate because of the doctrine of equitable conversion. *Dunsmore* v. *Lyle*, 87 Va. 391, 392-93, 12 S.E. 610, 611 (1891).

Under the circumstances of this case, we cannot say that the trial court abused its discretion in requiring specific performance of the Yamadas' clearly enforceable and unobjectionable real estate contract. Despite the Yamadas' conceded good faith in relying on their attorney's erroneous advice, they cannot impose the burden of that erroneous advice upon the sellers. The record discloses that the Yamadas' title attorney, and other counsel later employed by the Yamadas, knew that other attorneys disagreed with their title attorney's opinion and that the sellers were insisting that their title was good and marketable. Because that knowledge was acquired by the Yamadas' attorneys in the course of their efforts on the Yamadas' behalf, it is imputed to the Yamadas. *Allen Realty Corp.* v. *Holbert*, 227 Va. 441, 446, 318 S.E.2d 592, 594 (1984) (generally, knowledge of agent imputed to principal); *Minneapolis, St. P. & S. Ste. M. R.R.* v. *St. Paul Mercury-Indemnity Co.*, 268 Minn. 390, 405, 129 N.W.2d 777, 787 (1964) (knowledge of attorney imputed to client).

For all these reasons, we will affirm the action of the trial court and remand the case for further proceedings.

*Affirmed and remanded.*