BLUE CROSS AND BLUE SHIELD OF VIRGINIA

v.

ST. MARY'S HOSPITAL OF RICHMOND, INC.

Record No. 920146

ST. MARY'S HOSPITAL OF RICHMOND, INC.

v.

BLUE CROSS AND BLUE SHIELD OF VIRGINIA

Record No. 920173

January 8, 1993

Present: Compton, Stephenson, Whiting, Lacy, Hassell, and Keenan, JJ.,
and Poff, Senior Justice

*Gilbert E. Schill, Jr. (James P. McElligott, Jr.; Robert T. Adams; Catherine Currin Hammond; Thomas J. Stallings; Thomas E. Martenstein; Jeanette D. Rogers; McGuire, Woods, Battle & Boothe*, on briefs), for appellant. (Record No. 920146)

*Judith B. Henry (Martin A. Donlan, Jr.; Thomas F. Hancock; Nicholas A. Spinella; Crews & Hancock; Spinella, Owings & Shaia*, on brief), for appellee. (Record No. 920146)

*Amicus Curiae:* HCA Health Services of Virginia, Inc. (William D. Iverson; William J. Shieber; Covington & Burling, on brief). (Record No. 920146)

*Judith B. Henry (Martin A. Donlan, Jr.; Thomas F. Hancock; Nicholas A. Spinella; Crews & Hancock; Spinella, Owings & Shaia*, on brief), for appellant. (Record No. 920173)

*Gilbert E. Schill, Jr. (James P. McElligott, Jr.; Robert T. Adams; Catherine Currin Hammond; Thomas J. Stallings; Thomas E. Martenstein; Jeanette D. Rogers; McGuire, Woods, Battle & Boothe*, on briefs), for appellee. (Record No. 920173)

JUSTICE STEPHENSON delivered the opinion of the Court.

The principal issues in these consolidated appeals are (1) whether Code § 38.2-4209, which provides for "[p]referred provider subscription contracts," is preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*; and, if it is not, (2) whether Blue Cross and Blue Shield of Virginia (Blue Cross) violated Code § 38.2-4209(C) when it established a preferred provider organization (PPO) in the Richmond/Tri-Cities Area (the Area).

■ Code § 38.2-4209 is set forth in Chapter 42 (entitled, "Health Services Plans") of Title 38.2 (entitled, "Insurance") of the Code of Virginia (1990 Repl. Vol.). It reads as follows:

A. As used in this section, a "preferred provider subscription contract" is a contract that specifies how services are to be covered when rendered by providers participating in a plan, by nonparticipating providers, and by preferred providers.

B. Notwithstanding the provisions of §§ 38.2-4218 and 38.2-4221, any nonstock corporation may, as a feature of its plan, offer preferred provider subscription contracts pursuant to the requirements of this section that limit the numbers and types of providers of health care services eligible for payment as preferred providers.

C. Any such nonstock corporation shall establish terms and conditions that shall be met by a hospital, physician or other type of provider listed in § 38.2-4221 in order to qualify for payment as a preferred provider under the subscription contracts. These terms and conditions shall not discriminate unreasonably against or among health care providers. No hospital, physician or type of provider listed in § 38.2-4221 willing to meet the terms and conditions offered to it or him shall be excluded. Differences in prices among hospitals or other institutional providers produced by a process of individual negotiations with the providers or based on market conditions, or price differences among providers in different geographical areas shall not be deemed unreasonable discrimination. The Commission shall have no jurisdiction to adjudicate controversies growing out of this subsection.

D. Mandated types of providers listed in § 38.2-4221 and types of providers whose services are required to be made available and which have been specifically contracted for by the holder of any subscription contract shall, to the extent required by § 38.2-4221, have the same opportunity as do doctors of medicine to qualify for payment as preferred providers.

E. Preferred provider subscription contracts shall provide for payment for services rendered by nonpreferred providers, but the payments need not be the same as for preferred providers.

I

St. Mary's Hospital of Richmond, Inc. (St. Mary's), filed a bill of complaint against Blue Cross, alleging that Blue Cross discriminated against St. Mary's in the negotiation of a preferred provider subscription contract and seeking both declaratory and injunctive relief. St. Mary's asked the trial court to declare that Blue Cross had violated Code § 38.2-4209(C) and to enjoin any future violations of the statute. St. Mary's also asked the court to order Blue Cross to establish terms and conditions that St. Mary's could meet in order to qualify as a preferred provider and to accept St. Mary's as such a provider. Blue Cross, by its answer, denied that it had discriminated against St. Mary's or had violated the provisions of Code § 38.2-4209(C). Blue Cross also asserted, as an affirmative defense, that ERISA preempted St. Mary's' claims.

The trial court, following a four-day *ore tenus* hearing, ruled that (1) the requirements of Code § 38.2-4209 were not preempted by ERISA, and (2) Blue Cross had not violated Code § 38.2-4209(C) either in its initial offer of terms and conditions to St. Mary's or in its subsequent negotiations with St. Mary's. However, because the five-year terms of certain new preferred provider subscription contracts exceeded the three-year period set forth in Blue Cross' initial proposal, the trial court enjoined Blue Cross from operating the PPO in the Area after April 30, 1994, the expiration date of the initial proposed three-year term. Both Blue Cross and St. Mary's appeal from the trial court's judgment.

II

■ As part of the operation of its health services plan, Blue Cross markets a PPO, under the name of "KeyCare," in various areas of the Commonwealth. The PPO consists of a network of health care providers who have contracted to render care at discounted rates and is designed to contain health care costs. The KeyCare plan is not available to individual subscribers directly, but is available only to employee groups.

Blue Cross encourages patients to use preferred providers by imposing a penalty of approximately 30% on patients who use non-preferred providers. Although patients have the right to choose their providers, a patient who receives services from a non-preferred provider must pay the additional charge therefor.

The incentive for becoming a preferred provider is an anticipated increase in patient volume. Consequently, in order for a PPO to be successful, the network of providers must be limited.

■ For a number of years, Blue Cross has offered its KeyCare PPO to employee groups in the Area. Effective April 30, 1991, however, all prior subscription contracts were to expire. Therefore, Blue Cross had to establish a new network of preferred providers (PPO I) and enter into new contracts.

Consequently, on December 11, 1990, Blue Cross sent its PPO I proposal to all acute care, psychiatric, and specialty care hospitals in the Area. The proposal consisted of a "PPO I Network Hospital Agreement" and a cover letter transmitting the proposal. In the cover letter, Blue Cross notified each hospital that (1) acceptance of the proposal without modification on or before January 25, 1991, would guarantee a hospital's inclusion in the new network of preferred providers; (2) if terms or conditions were modified or rejected by a hospital, Blue Cross had the option of not negotiating further with that hospital, in which case, that hospital would be excluded from the network; (3) further negotiations, should they occur, did not guarantee inclusion in the network; (4) a hospital desiring to submit a counterproposal could do so on or before January 25, 1991; and (5) if a hospital was not included in the network, another opportunity for inclusion would not be offered until May 1, 1994, three years after the expiration of all existing contracts.

The proposal contained both price and nonprice terms and conditions. All hospitals providing similar services were offered identical nonprice terms and conditions. The price terms, however, varied

between hospitals. In developing the price differential, Blue Cross took into account historical differences among payment levels and the types of cases for which the respective hospitals provided care.

Twenty-seven hospitals received proposals, and thirteen accepted the terms and conditions without modification. St. Mary's, Henrico Doctors' Hospital (Henrico Doctors'), Chippenham Medical Center (Chippenham), and Johnston-Willis Hospital (Johnston-Willis) were among the hospitals that rejected the initial terms and conditions. These four hospitals, however, did send Blue Cross separate counterproposals, and Blue Cross elected to pursue negotiations with all of them.

■ For approximately two months, Blue Cross and St. Mary's engaged in serious negotiations. As negotiations progressed, Blue Cross and St. Mary's were able to agree on almost all of the non-price terms and conditions: With respect to the price terms, Blue Cross offered St. Mary's an increase of 33.82% over the gross payment that St. Mary's was receiving under the existing contract for inpatient services and an increase of more than 40% over the terms in Blue Cross' initial proposal. At the insistence of St. Mary's, Blue Cross agreed that payment be calculated as a percentage of St. Mary's' charges, rather than on the basis of a fixed price per case, which Blue Cross preferred. St. Mary's, however, rejected Blue Cross' price term proposal, insisting upon an increase of almost 90% over the gross payment under the existing contract.

On March 3, 1991, St. Mary's proposed limiting the network of hospital providers. Under this proposal, St. Mary's would accept an incrementally larger discount as more hospitals were excluded. The greatest discount that St. Mary's proposed was payment of 74% of charges for inpatient services, provided Henrico Doctors', Chippenham, Johnston-Willis, and four other hospitals were excluded from the network of preferred hospitals.

Blue Cross rejected this proposal because it believed that St. Mary's' proposed discount of 26% was not sufficient to justify the exclusion of Henrico Doctors', Chippenham, and Johnston-Willis, as those three hospitals historically had provided about 42% of Key-Care inpatient admissions. Blue Cross, thereupon, asked St. Mary's to make its best counterproposal before March 29, 1991.

On March 28, 1991, St. Mary's submitted two additional proposals to Blue Cross. One offer proposed a full network and greater discounts to St. Mary's, provided St. Mary's received additional patient volume. This proposal was unacceptable to Blue Cross

because it "had no mechanism for steering" additional patients to St. Mary's.

St. Mary's' other proposal did not contain specific price terms. Instead, St. Mary's offered to match the price terms as finally submitted by Henrico Doctors'. Unbeknownst to St. Mary's, however, the proposal of Henrico Doctors' offered one price if St. Mary's were included in the network and a lower price if St. Mary's were not included in the network. Blue Cross reasoned that it was impossible for St. Mary's to match the Henrico Doctors' price proposal. Not having received an acceptable offer from St. Mary's by the March 29, 1991 deadline, Blue Cross did not include St. Mary's in the network.

During the same two-month period, Blue Cross also was negotiating with Hospital Corporation of America (H.C.A.), owner of Henrico Doctors', Chippenham, and Johnston-Willis. On March 6, 1991, Blue Cross raised the possibility of limiting the network to these three hospitals. Shortly thereafter, H.C.A. proposed a subscription contract that limited the network and that provided for a five-year term, decreases in reimbursement rates, and a fixed price per case. Blue Cross accepted this proposal, and a basic agreement was reached on March 27, 1991.

### III

Before reaching the merits of this case, we first must address Blue Cross' contention that St. Mary's' claims are preempted by ERISA. Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan . . . ." However, § 514(b)(2)(A) of ERISA, 29 U.S.C. § 1144(b)(2)(A), provides that, with one exception, ERISA shall not "exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." The one exception, found in § 514(b)(2)(B) of ERISA, 29 U.S.C. § 1144(b)(2)(B), the so-called "deemer clause," states that no employee benefit plan "shall be deemed to be an insurance company or other insurer . . . or to be engaged in the business of insurance . . . for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts . . . ."

St. Mary's advances two arguments in response to Blue Cross' preemption claim. First, St. Mary's asserts that Code § 38.2-4209 does not relate to any employee benefit plan. Second, St. Mary's

argues that, even if the statute does relate to an employee benefit plan, the statute would not be preempted because it regulates insurance. We will focus our attention upon St. Mary's' second argument.[1]

▋ *Metropolitan Life Insurance Co.* v. *Massachusetts*, 471 U.S. 724 (1985), is similar to the present case. At issue in *Metropolitan Life* was a Massachusetts statute, Mass. Gen. Laws Ann. ch. 175, § 47B (West Supp. 1985), which required that certain minimum mental-health-care benefits be provided a Massachusetts resident who was insured under a general health insurance policy or an employee health-care plan that covered hospital and surgical expenses. 471 U.S. at 727. This type of statute, commonly known as a mandated-benefit law, first appeared in the early 1970s. One question presented was whether the Massachusetts statute was preempted by ERISA. *Id.* The Supreme Court held that the Massachusetts statute, as applied, is a law that regulates insurance, within the meaning of § 514(b)(2)(A) of ERISA, and, therefore, is not preempted under § 514(a). *Id.* at 758.

Justice Blackmun, speaking for a unanimous Court, stated the following:

> To state the obvious, [the Massachusetts statute] regulates the terms of certain insurance contracts, and so seems to be saved from pre-emption by the saving clause as a law "which regulates insurance." This common-sense view of the matter, moreover, is reinforced by the language of the subsequent subsection of ERISA, the "deemer clause," which states that an employee-benefit plan shall not be deemed to be an insurance company "for purposes of any law of any State purporting to regulate insurance companies, *insurance contracts*, banks, trust companies, or investment companies." § 514(b)(2)(B), 29 U.S.C. § 1144(b)(2)(B) (emphasis added). By exempting from the saving clause laws regulating insurance contracts that apply directly to benefit plans, the deemer clause makes explicit Congress' intention to include laws that regulate insurance contracts within the scope of the insurance laws preserved by the saving clause. Unless Congress intended to include laws regulating insurance contracts within the scope of the insurance

---

[1] Since oral argument in the present case, the Supreme Court decided *District of Columbia* v. *Greater Washington Board of Trade*, 61 U.S.L.W. 4039 (Dec. 14, 1992). This case, however, does not involve ERISA's insurance saving clause.

saving clause, it would have been unnecessary for the deemer clause explicitly to exempt such laws from the saving clause when they are applied directly to benefit plans.

*Id.* at 740-41.

Additionally, the Supreme Court rejected the argument that the Massachusetts statute was, in reality, a health law and not a "traditional insurance law" intended to be saved by § 514(b)(2)(A) of ERISA. *Id.* at 741. The Court noted that "[t]he presumption is against pre-emption" and nothing in ERISA "purports to distinguish between traditional and innovative insurance laws." *Id.*

■ Code § 38.2-4209 is a part of the Insurance Code and regulates the manner in which a PPO may be established and operated under a preferred provider subscription contract. The purposes of a PPO are to achieve lower costs for insureds and to maximize an insured's freedom of choice among health care providers. Thus, applying the "common-sense" approach articulated in *Metropolitan Life*, we conclude that Code § 38.2-4209 "regulates insurance" within the meaning of ERISA's exception to its preemption clause.[2] Therefore, Code § 38.2-4209 has not been preempted by ERISA. We also find support for our conclusion from decisions of other courts. *See, e.g., Blue Cross Hospital Service, Inc.* v. *Frappier*, 681 S.W.2d 925 (Mo. 1984) (en banc), *vacated and remanded*, 472 U.S. 1014 (1985), *upon remand*, 698 S.W.2d 326 (Mo. 1985) (en banc); *Insurance Comm'r of State of Maryland* v. *Metropolitan Life Ins.*, 296 Md. 334, 463 A.2d 793 (1983). *Contra HCA Health Services of Va., Inc.* v. *Aetna Life Ins. Co.*, 803 F.Supp. 1132 (E.D. Va. 1992); *Stuart Circle Hosp. Corp.* v. *Aetna Health Management*, 800 F.Supp. 328 (E.D. Va. 1992).

## IV

St. Mary's contends that the trial court erred in finding that Blue Cross did not "discriminate unreasonably" against St. Mary's in violation of Code § 38.2-4209(C). St. Mary's asserts that Blue Cross dealt more favorably with H.C.A., on behalf of Doctors' Hospital, Chippenham, and Johnston-Willis, than it did with St. Mary's. In support of this assertion, St. Mary's claims that "Blue Cross

---

[2] The insurance exception is sufficient to decide this issue. Therefore, we do not decide whether Code § 38.2-4209 "relate[s] to any employee benefit plan."

never negotiated St. Mary's limited network offers, but . . . did negotiate and consummate a limited network with [Henrico Doctors, Chippenham, and Johnston-Willis]."[3] We do not think that a fair reading of the record supports St. Mary's' contention.

No useful purpose would be served by again recounting the voluminous evidence. A few observations will suffice. Blue Cross' negotiator testified that he advised St. Mary's that Blue Cross would consider any of St. Mary's' limited network offers "at any point in time throughout the whole process." Blue Cross' negotiator further testified that St. Mary's and Blue Cross never were able to consummate an agreement because St. Mary's' price terms were unreasonably high. Additionally, St. Mary's' chief negotiator testified that Blue Cross' personnel had treated St. Mary's fairly, and that they were honest, reasonable, and professional in their negotiations.

After hearing four days of testimony *ore tenus*, the trial judge stated his findings as follows:

> I find from the evidence that the negotiations between Blue Cross and St. Mary's were conducted in good faith throughout the negotiating process. I do not find any unreasonable discrimination on the part of Blue Cross. The fact that they eventually negotiated a limited network proposal with H.C.A. did not discriminate against St. Mary's. St. Mary's had the opportunity to be a part of the network as late as March 26 and 27th. For reasons that they deemed appropriate they opted not to accept the last proposal by Blue Cross. The evidence indicates to me that if they had accepted the last offer then both St. Mary's and H.C.A. would have been in the network.

■ Where, as here, a trial court hears evidence *ore tenus*, a reviewing court is bound by the trial court's factual findings unless they are plainly wrong or unsupported by the evidence. Code § 8.01-680; *Yamada* v. *McLeod*, 243 Va. 426, 430-31, 416 S.E.2d 222, 224 (1992). Furthermore, the reviewing court must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the party prevailing at trial. *Ravenwood*

[3] In full network offers, potential preferred providers propose discounts, not knowing whether other potential providers will be excluded from the network. In limited network offers, potential providers, knowing that some providers will be excluded from the network, propose larger discounts in anticipation of greater patient volume.

*Towers, Inc.* v. *Woodyard*, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992).

▆ Viewing the evidence in the light most favorable to Blue Cross, we cannot say that the trial court's findings of fact are plainly wrong or unsupported by the evidence. We hold, therefore, that the trial court did not err in finding that Blue Cross did not discriminate unreasonably against St. Mary's, in violation of Code § 38.2-4209(C).[4]

## V

Blue Cross also contends that the trial court erred in voiding the last two years of the contract with H.C.A., on behalf of Henrico Doctors', Chippenham, and Johnston-Willis. Blue Cross asserts, *inter alia*, that the trial court's injunction was not based upon a justiciable claim.

▆ St. Mary's brought the present case under the declaratory judgment statute. Code §§ 8.01-184 to -191. In such cases, circuit courts are empowered to make "binding adjudications of right" in cases of "actual controversy" involving an "antagonistic assertion and denial of right." Code § 8.01-184. The controversy, therefore, must be one that is "justiciable," meaning a controversy in which there are "specific adverse claims, based upon present rather than future or speculative facts, [that] are ripe for judicial adjustment." *City of Fairfax* v. *Shanklin*, 205 Va. 227, 229, 135 S.E.2d 773, 775 (1964); *accord Reisen* v. *Aetna Life & Cas. Co.*, 225 Va. 327, 331, 302 S.E.2d 529, 531 (1983). Thus, the declaratory judgment statute does not authorize courts to render advisory opinions or decide moot or speculative issues. *Id.*

In *Shanklin*, a taxpayer brought a declaratory judgment proceeding asking the court to declare that certain sections of a city's zoning ordinance were invalid insofar as they purported to confer upon the board of zoning appeals authority to issue special use permits for the construction of apartments. 205 Va. at 227-28, 135 S.E.2d at

---

[4] In its second assignment of error, St. Mary's states the following: "The trial court erred by failing to hold that Blue Cross' discrimination in favor of the HCA Hospitals [Doctors' Hospital, Chippenham, and Johnston-Willis] is not protected under Va. Code § 38.2-4209(C) because it was not the product of individual price negotiations between Blue Cross and a single provider." Having concluded that Blue Cross did not discriminate unreasonably against St. Mary's (St. Mary's' first assignment of error), we see no reason to address this assignment of error. In other words, the second assignment of error is subsumed in the first.

774. Although it was agreed that " '[n]o specific case regarding apartment usage within the City is involved in [the] cause,' " *id.* at 230, 135 S.E.2d at 776, the trial court ruled that the challenged sections of the ordinance were invalid, *id.* at 228, 135 S.E.2d at 775.

█ In reversing the trial court's judgment, we rejected the taxpayer's contention that, because he had the right to attack the authority of the board of zoning appeals after it had made a decision, he also had the right to challenge its authority before such a decision was made. *Id.* at 230, 135 S.E.2d at 776. We concluded that the suit "merely sought an advisory opinion, or a decision upon a moot question, or an answer to a speculative inquiry." *Id.* at 231, 135 S.E.2d at 776. We explained some of the problems that such a decision could cause:

> Too much is here left to speculation. The board may never again be called upon to act regarding an application for a special use permit for apartments. Or, if someone does apply, and the plaintiff opposes the application, the board may decide the case in the plaintiff's favor. Or, if the board grants such a permit, the apartments may be in a location in the city which would not aggrieve the plaintiff.

*Id.*

Similar problems could result from the trial court's ruling in the present case. The ruling is based upon·speculation because no one can say with reasonable certainty what facts may exist or what the law may be in 1994.

█ Additionally, "[c]ourts cannot afford [declaratory] 'relief' when they lack the power to bind all parties to the controversy." *Erie Insurance Group* v. *Hughes*, 240 Va. 165, 170, 393 S.E.2d 210, 212 (1990). In the present case, therefore, the trial court was without jurisdiction to issue the injunction because Henrico Doctors', Chippenham, and Johnston-Willis, who are "parties to the controversy," are not before the court and would not be bound by the injunction.

For these reasons, we hold that the trial court's injunction is not based upon a justiciable claim. Consequently, the trial court erred in granting the injunction.

## VI

In conclusion, we will affirm the trial court's judgment in Record No. 920173, holding that the trial court did not err in ruling that Blue Cross did not discriminate unreasonably against St. Mary's, in violation of Code § 38.2-4209(C).[5] In Record No. 920146, we will affirm the trial court's judgment with respect to its ruling that Code § 38.2-4209 has not been preempted by ERISA, and we will reverse the portion of the judgment that enjoined Blue Cross from operating the PPO I after April 30, 1994, and enter final judgment in favor of Blue Cross.

*Record No. 920173: Affirmed.*
*Record No. 920146: Affirmed in part,*
*reversed in part,*
*and final judgment.*

---

[5] We do not consider the merits of St. Mary's' Assignment of Error No. 3, alleging that the trial court erred in admitting into evidence portions of certain depositions, or of Assignment of Error No. 4, alleging that the court erred in admitting into evidence Blue Cross Exhibits 101 and 104. The trial court stated that it would not consider or rely upon this challenged evidence in arriving at its decision. Thus, assuming the evidence was inadmissible, any error was harmless.