**In re BEST PRODUCTS CO., INC., et. al., Debtors.**

**Bankruptcy Nos. 91 B 10048 to 91 B 10053 (TLB).**

United States Bankruptcy Court, S.D. New York.

Aug. 2, 1993.

As Amended Aug. 6, 1993.

Weil, Gotshal & Manges by Kevin Barrett and Ronald Klempner, New York City, for debtors.

Stroock & Stroock & Lavan by David H. Botter, New York City, for Official Committee of Unsecured Creditors.

Seward & Kissel by M. William Munno and John J. Galban, New York City, for Mut. Life Ins. Co. of New York.

### DECISION ON MUTUAL LIFE INSURANCE COMPANY'S MOTION

TINA L. BROZMAN, Bankruptcy Judge.

"So long as people do not mean what they say or do not say what they mean, there will be enough uncertainty to keep everyone busy hiding intent and obfuscating meaning." *In re Winston Mills, Inc.,* 6 B.R. 587, 596 (Bankr.S.D.N.Y.1980). Not a lot has changed since Judge Roy Babitt wrote those words. My task is to determine, much as he did, whether a transaction which is denominated a lease is, instead, a financing vehicle. But there, the lease was between third parties. Here, it is between affiliated corporations.

The Mutual Life Insurance Company of New York ("MONY") has sought relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code, or alternatively, an order prohibiting Best Products Co., Inc. ("Best") and its subsidiaries (collectively called the "Best Group"), the debtors in possession, from using sublease rents which MONY says are its cash collateral. This decision deals not with that requested relief, but only with what the parties have deemed a threshold issue, whether a sublease to Best from its subsidiary, Best California, Inc. ("Best California"), is truly a sublease, as MONY would have me hold, or whether the sublease functions merely as an intermediary in a loan from MONY to Best, as Best suggests.

### I.

*Best Decides to Finance its Construction of a Showroom in Puente Hills*

The Best Group are discount retailers operating some 150 catalog showrooms, a mail order business and a chain of approximately 15 jewelry stores. This dispute involves a catalog showroom located in Puente Hills, California (the "Puente Hills showroom").

In 1979, Best decided to construct and operate a showroom in the Puente Hills area of Industry City, California. To accomplish this, Best needed to enter into a ground lease for the underlying real property and then obtain funding for the construction costs associated with building and operating that showroom. In March, 1979, Best entered into a ground lease with Wincorp Industries ("Wincorp").

With the lease in place, Best was postured to look for financing; it enlisted the help of a broker, Wells Fargo Mortgage Company ("Wells Fargo"). Best executed a loan application describing the type of loan it was seeking, a $2.2 million loan made to a subsidiary of Best, rather than Best itself, secured by the building constituting the proposed showroom. The requested term of the loan was 28 years, its interest rate, 10%. The application made no mention of any sublease arrangement nor did it mention who would own the showroom. The application did state, however, that the land would be leased to Best by the ground lessor.

*MONY Negotiates with Best*

Wells Fargo began "shopping" the loan to various lending institutions, including MONY. MONY soon undertook due diligence, including the preparation of an appraisal of the proposed showroom. A Wells Fargo appraiser, utilizing statistics for comparable facilities, concluded that the adjusted rent per square foot, per month, of 45.2 cents was a reasonable figure which fell within the range for comparable facilities of between 37.2 cents and 51.2 cents. He then projected construction costs based on figures provided by Best with respect to similarly constructed facilities. As a result, he determined that this leasehold estate would generate a yearly net income of $363,923. Said differently, that sum was the highest rent that the appraiser calculated Best would pay. This net income led him, in turn, to assign an appraised value for the proposed showroom of $2.97 million, which was well in excess

of the $2.2 million Best sought to have a subsidiary borrow.

Not long after, Michael Davis, an Assistant Regional Mortgage Officer in MONY's San Francisco office, approved the appraisal and completed a formal recommendation for the Puente Hills loan. The recommendation stated that the borrower would be

> a subsidiary of Best Products Company, Inc., as yet to be formed. At this point in time, we have no further information concerning the proposed borrower. The borrowing entity's sole asset will consist of the subject property under lease to the parent corporation, Best Products Company, Inc.[1]

*See* Best Exh. 8A at 2. The recommendation also provided that whatever subsidiary Best ultimately chose as the borrower had to be acceptable to MONY. The recommendation, which outlined Best's net worth, operating history and annual revenues, characterized as "minus factors" that (1) the loan would be a leasehold loan, and (2) the borrowing entity would be a "shell company." It dubbed as one of the "plus factors" the leasing of the entire facility to a single, strong tenant. *Id.* at 3. Those comments and criticisms were later noted in a MONY inter-office communication between two officers. MONY's senior real estate officers approved the loan and delivered it to MONY's Investment Committee for approval. The approval described the borrower as "a nominee of Best Products Company, Inc. without liability for repayment of indebtedness." Best Trial Exh. 8C. Some three weeks later, MONY and Best entered into a formal loan commitment agreement consistent with the terms of the predecessor documents and naming as the borrower "Best Products Company, Inc., or a nominee satisfactory to MONY ... without personal liability." *See* Best Answer Exh. B.

The parties contemplated that the Puente Hills loan would close in early 1980. But delays ensued, causing the commitment to expire. Nevertheless, the parties agreed to revive it, with certain modifications.

Negotiations resumed in late 1980. The loan structure upon which the parties eventually agreed was similar to that employed with another Best showroom, the Mission Viejo showroom, also financed by MONY.[2] Best was to assign its ground lease to Best California, an existing subsidiary formed in connection which the Mission Viejo loan. Best California would sublet the premises back to Best. As additional security, MONY would take a security interest in the sublease payments. Thus, its security would consist of the realty as well as the income stream. This credit sublease format was consistent with MONY's standard leasehold mortgage loan practice which dictated that MONY not close the Best transaction without an acceptable sublease being in place.

The effort to arrive at this loan structure caused a flurry of correspondence between counsel for Best and MONY. An issue arose with respect to whether Best could amend the ground lease with Wincorp so that if the ground lessee (ultimately, Best California) defaulted in its obligations under that lease, the Best–Best California sublease would not be terminated as well. The amendment would have the effect of keeping Best "on the hook" should Best California default. *See* Monahan Reply Aff.Exh.E. Best's counsel suggested to MONY's counsel that

> As an alternative to an amendment to the Ground Lease, we propose that the sublease contain an express agreement by Best Products to attorn or enter into a new lease with the leasehold mortgagee or its nominee in the event the Ground Lease is terminated ... Except in the event of a bankruptcy by Best Products,

---

**1.** This is the first mention in the record of the borrowing subsidiary owning the Puente Hills showroom and leasing it to Best.

**2.** In the Mission Viejo transaction, MONY provided permanent financing for the showroom to Best, albeit that Best California, which took by

assignment from Best its interest in that showroom, was the ground lessee and sublessor to Best. MONY was secured both by a mortgage on Best California's leasehold interest as well as by an assignment of all of Best California's interest in the sublease rents.

in which case such an attornment might be deemed an avoidable executory contract, I can see no reason why such a contractual agreement by Best Products would not be enforceable.

*Id.*

MONY did not like that idea and instead insisted that Best amend the ground lease to provide that its termination would not terminate the sublease. In response to Best's inquiry into whether it could put a provision into the deed of trust that all of Best California's obligations could be performed by Best Products, MONY's counsel declined, stating that

> I do not think we want a provision in the Deed of Trust to the effect that all obligations of Best California can be performed by Best Products. The whole purpose of the Credit Lease is to work around certain antideficiency rules and rules requiring a lender to proceed against real property. I think we would jeopardize the goal the Credit Lease is designed to achieve by making the change in the Deed of Trust that you requested.

Best Trial Exh. 7.

Having finally hammered out the terms of the loan, Best sought to bring it to fruition. Best's counsel described it to Wincorp as follows:

> Best Products will assign its interest in the ground lease between Wincorp Industries and Best Products (the "Ground Lease") to Best California, Inc., a wholly owned subsidiary of Best Products. Best California will then sublease the land and showroom back to Best Products. Of course, Best Products will still remain liable [to Wincorp] under the Ground Lease. MONY will make the loan to Best California. The security for this loan will be, in major part, the sublease between Best Products and Best California (the "Credit Sublease").

*See* Monahan Reply Aff.Exh.F.

### The Transaction Closes

On May 6, 1981, MONY lent the $2.2 million to Best California, taking back a security interest in the building and its revenues. (Perfection of the security interests is not challenged.) Best California had no assets or property interests other than in the Mission Viejo showroom, no cash or revenues, and no accounts, deposit or checking, into which it could make deposits or payments. Indeed, MONY considered Best California to be the "technical borrower." *See* Rappaport Dep. at 17. On that same date, Best assigned to Best California its interest in the ground lease. Immediately thereafter, Best California "sublet" the premises back to Best pursuant to what the parties agree purports to be a net lease.

The sublease, which incorporated almost verbatim a variety of provisions from the ground lease, obligated Best to pay Best California $363,923 per year in rent. *See, e.g.,* Sublease Art. 2/Ground Lease Art. V; Sublease Art. 6/Ground Lease Art. X; Sublease Art. 11/Ground Lease Art. XI. This rent exceeded by a little the amounts necessary to pay the ground lessor's rent and MONY's loan. Best sublet the premises from Best California "as is," with no representations or warranties. Sublease § 1.1. Best agreed to assume Best California's obligation to pay real property taxes, sublease § 6.1, and to maintain insurance. Sublease § 11.3. In the event the Puente Hills showroom were damaged or destroyed, Best, and not Best California, was for the most part obligated to make whatever repairs were necessary, sublease §§ 12.1 and 12.2, and Best's obligation to pay rent continued uninterrupted (with a reduction for the ground rent if the obligation to pay ground rent were abated or reduced). Sublease §§ 12.4 and 12.5. The sublease unconditionally obligated Best to make payments to Best California even if Best California could not provide Best with possession of the property. Sublease §§ 5.1, 12.1–.5. Best also waived any statutory rights of termination which it might have if the premises were partly or wholly destroyed. Sublease § 12.6. In much the same vein, if the premises were taken by eminent domain, so long as MONY's mortgage were outstanding, Best could not terminate the sublease without

MONY's prior written approval and, with one minor exception not here relevant, would remain obligated to pay rent (again with a reduction in the amount of any abatement under the ground lease).[3] Sublease §§ 10.2, 10.3, 10.4 and 10.5. Although the sublease extended beyond the life of the MONY note, the basic term of the sublease would not expire until whatever date was required to repay the MONY loan in full. Sublease § 3.2. And whereas the sublease rent, as indicated above, was somewhat greater than the aggregate of the amounts owed by Best California to the ground lessor and as periodic principal and/or interest payments due MONY, the sublease rent automatically increased at the same time and in the same amount as did increases in either the ground rent or MONY obligations. Sublease §§ 4.2 and 4.3. Finally, Best was responsible for property tax payments and expenses. Sublease §§ 5.1, 6.1, 7 and 8.

### Best Pays the Ground Lease and Loan Obligations Directly to Wells Fargo

Notwithstanding the structure of this transaction, the parties all but ignored its form for more than twelve years. From May 6, 1981, the date of MONY's loan, through the date the Best Group filed chapter 11 petitions, Best, and not Best California, paid all of Best California's obligations to the ground lessor and to MONY. Best California never paid the ground lease payments or the note payments to MONY, nor realistically could it have, given that it had no checking or deposit accounts into which it could deposit funds and out of which it could issue checks. Rather, Best paid directly Wells Fargo Mortgage Company, MONY's agent for the servicing of

MONY's loan, and did not pay the sublease rent to Best California.

### The Best Group Files Chapter 11 Petitions and Related Documents

On January 4, 1991, the Best Group, including Best California, filed chapter 11 petitions. As of the filing date, MONY claims the amount due on its note is $2.016 million, although Best claims it owes MONY only $1.99 million.

Stewart Kasen, president and chief executive officer of Best California, stated in his affidavit pursuant to Local Bankruptcy Rule 52 that Best California's principal business was leasing two pieces of property to its parent, Best. Best California's Statement of Financial Affairs recited that Best California was incorporated in 1979 for the purpose of acquiring, financing and leasing real property on which Best operates retail catalog showrooms, and that Best California was current in its monthly rental payments to the ground lessor, Copzel Properties (as successor-in-interest to Wincorp). Although Best listed the ground lease on its schedules of unexpired leases (and has extended the time within which it may assume or reject that ground lease), Best did not list the Puente Hills sublease on its list of unexpired leases (nor has Best ever sought an extension of time within which to assume or reject this sublease). Since the filing date, neither Best nor Best California has made payments to MONY, nor has Best paid any rent to Best California.

### II.

On August 10, 1992, eighteen months into this bankruptcy case, MONY brought

---

**3.** This provision in the sublease circumvents statutory law in California, the forum state. Section 1265.110 of its Code of Civil Procedure provides: "Where all the property subject to a lease is acquired for public use, the lease terminates." As such, the tenants are no longer obligated to pay rent to the condemnee upon the vesting of title to the property in the condemnor. *Redevelopment Agency of the City and County of San Francisco v. Superior Court,* 13 Cal.App.3d 561, 569, 91 Cal.Rptr. 886, 891 (Cal. App. 1st Dist.1970). Instead, a new relationship is created between the condemnor and those

lawfully occupying the premises, with either a tenancy at will or a tenancy from month to month being created, depending upon the circumstances. *Id., citing* Nichols, Eminent Domain, §§ 11.02, 11.03 & 24.5 (3d ed. 1985); *see also Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency,* 178 Cal.App.3d 435, 440, 223 Cal.Rptr. 728, 730 (Cal.App. 1st Dist.1986). Operation of the statute may be overcome by a contrary provision in the lease. California Law Revision Committee, comment to Code Civ. Proc. § 1265.110.

this motion for relief from the automatic stay, or alternatively, for an order prohibiting Best from using the sublease rents which MONY alleges are its cash collateral and ought be sequestered.

In its answer, Best[4] argued that the sublease was in fact not a true sublease but rather a financing vehicle set up for the purpose of facilitating MONY's secured financing of the Puente Hills showroom.[5] After the parties exchanged further briefs, I entertained argument. The parties asked that I bifurcate MONY's motion and address first whether the Best–Best California arrangement was a true lease or a secured financing vehicle.[6] Resolution of

that issue is not being undertaken by way of summary judgment; rather, probably recognizing the inherent ambiguities in what they had written, the parties presented extrinsic evidence of their practices and intentions.[7]

### III.

MONY would have me don blinders, confining my analysis of the economic substance of what occurred here to the sublease between Best and Best California, a parent and its subsidiary which entered into an agreement mandated not by their own business needs but by the fiat of their

4. Best claims that since Best California is a mere instrumentality of Best and lacks the financial wherewithal to make adequate protection payments even if directed to by this court, Best is the true party in interest. Accordingly, Best has submitted all responsive papers.

5. Best also pointed out that the sublease, if considered a true lease, had been rejected by operation of section 365(d)(4) of the Bankruptcy Code when Best failed to move for an extension of time to assume or reject it. (MONY made no attempt to secure this relief, either.) If a true lease, its rejection would give rise to a claim for damages as well as an administrative claim for use and occupancy since Best has not vacated the premises. It is not necessary to explore the legal question, not addressed by the parties, whether MONY's security interest would extend to the use and occupation claim possessed by Best California.

6. Best conceded, well into the hearings in this dispute, that even if the Best–Best California sublease were collapsed or determined to be a form of disguised financing, that determination will not end the disputes regarding MONY's rights. For under either scenario, MONY, as a secured creditor now of Best, might indeed be entitled to adequate protection to the extent it could prove that its collateral has declined in value. Best stated that the parties "might be fighting about nothing at all, other than when they [MONY] get paid ... [t]hey may be entitled to postpetition interest." See January 13, 1993 Hearing at 123. Nonetheless, since the parties spent so much time developing the issues which they tried, I will decide them in an effort to aid the parties to resolve the matter.

7. The unorthodox presentation of this dispute, in which I acquiesced, led to some difficulties in determining the bounds of the record, most of which were solved through stipulations. But there remained the issue of the parol evidence rule. MONY had urged in one of its briefs that

the rule prevented my looking at extrinsic evidence of the parties' intent. Nonetheless, MONY attempted to subsequently introduce through affidavits and live testimony a great deal of extrinsic evidence. I construe this as an implicit concession that the sublease is ambiguous. But even if there was no such concession, there can be little doubt that parol evidence is admissible because of the ambiguity of the agreement, which purports to be a net lease when the contents indicate something different. "It is precisely this ambiguity in the *terms* of the contract that requires the admission of parol evidence to determine the true intent of the parties in entering into the transaction." *Liona Corporation N.V. v. PCH Associates (In re PCH Associates)*, 804 F.2d 193, 197 (2d Cir.1986) (emphasis in original).

Under California law, the caption of a document does not dictate its legal effect. *Beeler v. American Trust Co.*, 24 Cal.2d 1, 20, 147 P.2d 583, 594 (1944) (what purports to be an absolute conveyance may be shown to be a mortgage, for the intention of the parties governs). Moreover, the label which the parties affix to their transaction *does not declare the rights of third parties* nor does it affect the legal consequences of the parties' agreement; it is the economic substance of the transaction to which the bankruptcy court must look. *See In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1183 (9th Cir.1988) (instrument which bears hallmarks of lease under California law is not susceptible to automatic rejection under section 365 of the Bankruptcy Code because of economic realities of transaction); *PCH*, 804 F.2d at 198. As the *Moreggia* court noted, "In this [the Ninth] Circuit we have also declined to require assumption or rejection of a purported lease that is in substance a security agreement, even where the agreement has taken on the surface formalities of a contract or unexpired lease that might otherwise come within the reach of section 365. *In re Pacific Exp., Inc.*, 780 F.2d 1482, 1487 (9th Cir.1986)." 852 F.2d at 1183.

lender. Best says I cannot look at the economic substance without collapsing this transaction, which will lead inexorably to the conclusion that this was a secured financing from MONY to Best.

The ability of a court to collapse a series of steps into one transaction depends upon the facts and circumstances of each case. In reality, collapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved in the transaction. *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 500–502 (N.D.Ill.1988), *on reconsideration* 1989 WL 18112 (N.D.Ill. March 2, 1989), *appeal certified by* 1989 WL 51068 (N.D.Ill. May 5, 1989); *accord Moody v. Security Pacific Business Credit, Inc.,* 127 B.R. 958, 992 (W.D.Pa.1991), *aff'd,* 971 F.2d 1056 (3d Cir. 1992) ("In analyzing the conveyances … we are convinced that we should 'collapse' the various steps in the … leveraged buyout and treat them as 'one integral transaction.' "); *In re O'Day Corp.,* 126 B.R. 370, 394 (Bankr.D.Mass.1991) ("In view of the fact that all parties … were aware of the structure of the transaction and participated in implementing it, the Court will focus on the substance of the LBO as one transaction, not on its form."); *In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990) (holding the court must look beyond the multicomponent transfers created by the parties to the essence of the transaction to assess its effect).

The concept of collapsing transactions arises predominantly in suits to set aside, as fraudulent, transfers made in conjunction with failed leveraged buyouts. In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme. *See, e.g., Wieboldt,* 94 B.R.

488; *U.S. v. Gleneagles Investment Co., Inc.,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd sub. nom.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied sub. nom.,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).[8] That determination entails a fact intensive, case by case analysis. *Lippi v. City Bank,* 955 F.2d 599, 612 (9th Cir.1992).

■ Although the transactions here were not part and parcel of a leveraged buyout, there are common threads between LBO "collapsing" cases and this one. From the outset, it is clear that MONY and Best contemplated a loan to Best and that Best California would serve merely as a conduit for the benefit of MONY. Michael Davis, a MONY loan officer, noted in May 1989 that the proposed borrower would be a subsidiary of Best that had yet to be formed and that that entity's sole asset would consist of the sublease to Best. Best Trial Exh. 8A. Davis also noted that MONY was loaning the $2.2 million to a "shell company," *id.,* which Steven Rappaport deemed the "technical borrower." Rappaport Dep. at 17. Those comments and criticisms were noted by more senior MONY loan officers two days later. The June 7, 1979 loan commitment again noted that the borrower was to be Best or a nominee satisfactory to MONY. Both parties understood that Best's obligations under the sublease were driving the transaction; indeed, counsel to Best and MONY attempted to structure the transaction so that if Best California defaulted under the ground lease, Best would still be obligated notwithstanding state antideficiency rules and rules requiring a lender to proceed against real property. Indeed, MONY was insistent upon this form of transaction. Best California said nothing different in Mr. Kasen's Rule 52 affidavit indicating that Best California was formed for the purpose of acquiring, financing and leasing the Puente Hills and Mission Viejo showrooms. MONY lent $2.2 million to Best California, an entity that had no assets, no deposit or checking accounts, and no

---

**8.** This is not to rule that other defenses which do not turn on knowledge of the defendant are unavailable.

sources of revenue with which to repay the loan aside from its interest as sublessor under the Puente Hills and Mission Viejo leases. MONY knew that the payments made under the loan would be funded solely through Best's payments. MONY not only sought to structure its financing of the Puente Hills showroom with the knowledge that the ground lease assignment and sublease would be part of that one transaction, but has admitted that those transactions were prerequisites to its loaning any money. *See* MONY Reply Memo at 2; January 13, 1993 Hearing at 133–34. Significantly, the only economic benefit Best derived from setting up this sublease was the benefit of MONY's acquiescing to lend it money for the Puente Hills showroom.

As discussed above, having put the sublease structure in place, the parties proceeded to ignore it. Never in the eleven years prior to the Best Group's bankruptcy did Wells Fargo or MONY protest the departure in practice from what the documents purported to establish. MONY urges that it did not know that Best and Best California had ignored the existence of the sublease. Whatever the merit of that contention as a factual matter, the record plainly establishes that Wells Fargo had plenty of information demonstrating that Best and Best California had never adhered to the sublease. Since Wells Fargo was undeniably MONY's agent, its knowledge may be imputed to MONY. *See, e.g., Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985) (applying New York law); *Redman v. Walters,* 88 Cal.App.3d 448, 152 Cal.Rptr. 42 (Cal.App. 1st Dist. 1979) and *Chapple v. Big Bear Super Market No. 3,* 108 Cal.App.3d 867, 167 Cal. Rptr. 103 (Cal.App. 4th Dist.1980) (applying California law); *Yamada v. McLeod,* 243 Va. 426, 416 S.E.2d 222 (1992) and *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592 (1984) (applying Virginia law).

 I cannot conclude that Best and MONY intended a loan from MONY to Best California, a subsidiary with no assets and no accounts. Rather, at bottom, this transaction was a loan from MONY to Best with Best California serving as a vehicle to "get around" the antideficiency rules. The sublease was not simply a triple net lease entered into between Best California and an unrelated third party. The sublease was entered into between parent and subsidiary to facilitate a loan to Best from MONY. Without Best's significant presence, MONY would not have loaned the subsidiary $2.2 million. And without MONY's insistence, Best and Best California would not have entered into a sublease. The provisions of the sublease paint a keen portrait of what the parties sought to accomplish here, to obligate Best to pay MONY through Best California even if there were no property to sublease. As the Second Circuit has noted, while the parties to a transaction may intend that, as between themselves, their relationship is to be governed by the labels they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement. *PCH,* 804 F.2d at 198. This is especially so in bankruptcy, where Congress has defined the legal consequences of commercial relationships. It would be inequitable to allow the parties' choice of label to affect the rights of third parties. *Id.; accord Moreggia,* 852 F.2d at 1182; *Pacific Exp.,* 780 F.2d at 1487. As the *PCH* court admonished, courts ought look beyond mere form to the circumstances of each case, including the economic substance of the transaction, to determine whether a true lease exists for purposes of the Bankruptcy Code. 804 F.2d at 198.

That I collapse the Best–Best California sublease is not the end of the inquiry under the factual scenario here. I am simply stripping away the "dressing" on these transactions and viewing the parties' transactions in light of the economic realities of what took place, a secured loan from MONY to Best. As Best has conceded, it may very well be that MONY is entitled to adequate protection to the extent it can show a decrease in the value of its collateral. However, I leave that determination for another day.