394 F.Supp.2d 585 (2005)
SR INTERNATIONAL BUSINESS INSURANCE CO., LTD., Plaintiff-Counterclaim Defendant,
v.
WORLD TRADE CENTER PROPERTIES, LLC, et al., Defendants-Counterclaimants.
World Trade Center Properties, LLC, et al., Counterclaimants,
v.
Allianz Insurance Company, et al., Additional Counterclaim-Defendants.
No. 01 CIV. 9291(MBM).
United States District Court, S.D. New York.
April 21, 2005.
*586 *587 John B. Massopust, Mark J. Feinberg, Roger D. Branigin, Zelle, Hofmann, Voelbel, Mason & Gette LLP, Minneapolis, MN, Karl S. Vasiloff, Paul Sullivan, Zelle, Hofmann, Voelbel, Mason & Gette LLP, Waltham, MA, Dale C. Christensen, Jr., John J. Galban, Seward & Kissel LLP, New York, NY, for Allianz Insurance Company.
Harvey Kurzweil, Robert Morrow, Dewey Ballantine LLP, New York, NY, Alan R. Miller, Robins, Kaplan, Miller & Ciresi LLP, Boston, MA, for Gulf Insurance Company, Industrial Risk Insurers, and Travelers Indemnity Company.
Carolyn H. Williams, Philip A. Sechler, Williams & Connolly LLP, Washington, DC, for Industrial Risk Insurers.
Michael Barr, Jane Stevens, Sandra Hauser, Sonnenschein, Nath & Rosenthal LLP, New York City, for Royal Indemnity Company.
Milton H. Pachter, Megan Lee, Timothy G. Stickelman, New York, NY, Timothy G. Reynolds, Michael J. Balch, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for The Port Authority of New York and New Jersey.
Peter K. Rosen, Vincent H. Herron, Los Angeles, CA, Blair Connelly, Latham & Watkins LLP, New York, NY, for WTC Retail LLC, Westfield WTC LLC, Westfield Corporation, Inc., and Westfield America, Inc.

*588 OPINION AND ORDER
MUKASEY, District Judge.
Now before the court is a partial summary judgment motion in which the Appraising Insurers[1] seek a bright-line ruling that the compensable World Trade Center ("WTC") retail rental value loss ended on December 30, 2003, the date at which Westfield WTC Holding LLC effectively transferred its leasehold interest in the WTC retail space to the Port Authority of New York and New Jersey ("Port Authority"). The Insured Parties[2] respond that the Appraising Insurers should be required to provide compensation for lost retail rents throughout the period it takes to restore the WTC properties, arguing (i) that the December 2003 transaction involved the sale only of a 100% ownership interest in the separate corporate entity that owned the retail lease, Westfield WTC LLC (the "Retail Lessee"), not a sale of the retail lease itself or an assignment of the Retail Lessee's insurance policies, and (ii) that any assignment of the relevant insurance policies to the Port Authority remained valid because the Retail Lessee had an "accrued" claim for all rental value losses to be incurred throughout the period of restoration. For the reasons stated below, the Appraising Insurers' motion for partial summary judgment is denied.

I.
The following facts are drawn primarily from the parties' papers and prior opinions in this litigation, familiarity with which is assumed. On July 24, 2001, Westfield WTC LLC (the "Retail Lessee") entered into a 99-year lease ("Net Lease") with the Port Authority to acquire an exclusive leasehold interest in the WTC retail space, commonly known as the Mall at the World Trade Center. (Westman Aff. ¶ 6; Blanco Aff. Ex. B.) The lease required an up-front investment of $110 million plus annual payments thereafter. (Westman Aff. ¶ 6.) To protect its interest in the retail space, the Retail Lessee, along with other Westfield entities, obtained property damage insurance for the "hard asset" of the WTC retail space and rental value loss insurance for the cash flow generated by the Net Lease (i.e., rents from retail tenants). (Appraising Insurers' Mem. of Law in Supp. of Mot. for Partial Summ. J. that WTC Retail Rental Value Loss Ends Dec. 30, 2003, at 2 ("Insurers' Mem. of Law").) Under the relevant policy language,[3] the Appraising Insurers agreed to pay, inter alia, the "actual loss of ... Rental Value sustained by the Insured due to the necessary `suspension' of the Insured's `operations' during the `period of restoration.'" (Insurers' Rule 56.1 Statement Ex. M § A.) "Rental Value" was defined as:
a. Total anticipated rental income;
b. Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be the obligation of the Insured; and
*589 c. Fair rental value of any portion of the Insured's premises that is occupied by the Insured;
less any operating expenses that do not continue from tenant occupancy of the premises as furnished and equipped by the Insured.
(Id. § A.2 (emphasis added).) The policy also included a standard no-assignment clause, which stated that the "insured's rights and duties under this policy may not be transferred without the written consent of the Company...." (Insurers' Rule 56.1 Statement ¶ 13.)
After the September 11th attacks, which led to an immediate suspension of all retail rental payments generated by the Net Lease, the Retail Lessee filed claims for property damage and rental value losses with the Appraising Insurers. (Insurers' Mem. of Law at 3; Westman Aff. ¶ 8, Ex. B; Blanco Aff. ¶¶ 5, 7, Ex. E.) Disputes arose and were submitted for appraisal; they remain pending. (Insurers' Mem. of Law at 4.)
On December 23, 2003, Westfield WTC Holding LLC entered into an Agreement for Purchase and Sale of Membership Interest Assets ("Purchase Agreement") with the Port Authority, effective December 1, 2003.[4] (Insureds' Rule 56.1 Statement in Opp'n ¶ 9; Blanco Aff. ¶ 2, Ex. A.) To make this transaction comprehensible, it is helpful first to describe briefly the various Westfield entities involved. Westfield America, Inc. ("Westfield America"), a Missouri corporation, owns approximately 66 regional shopping malls throughout the United States on behalf of an Australian property unit trust called Westfield America Trust. (See Westman Aff. ¶ 2; Insurers' Rule 56.1 Supplemental Statement ¶ 1.) On April 11, 2001, Westfield America LP, a Delaware limited partnership of which Westfield America is the general partner, formed two Delaware limited liability companies to own and manage the WTC retail leasehold: Westfield WTC Holding LLC ("Westfield WTC Holding") and Westfield WTC LLC (the "Retail Lessee"). (See Westman Aff. ¶¶ 3-5.)
Although both companies were separate entities under Delaware law, the evidence shows that Westfield WTC Holding managed the affairs of the Retail Lessee, a special purpose entity created by Westfield America specifically to hold the ground lease to the WTC retail space. (See Insurers' Rule 56.1 Supplemental Statement ¶¶ 2-6.) Viewing the corporate ownership ladder from the bottom up, the Retail Lessee was controlled by its sole owner and managing member, Westfield WTC Holding, which in turn was solely owned and managed by Westfield America LP, which in turn was controlled by Westfield America. (See Insurers' Reply Mem. at 1; Insureds' Mem. in Opp'n at 3-4.) As a result, according to Mark Stefanek, Westfield America's chief financial officer, the Retail Lessee was the "wholly-owned entity" of Westfield America and served as "just its ownership vehicle" for the WTC retail leasehold. (Insurers' Rule 56.1 Statement Ex. E at 13.)
Under the December 2003 Purchase Agreement, Westfield WTC Holding sold its 100% membership interest in the Retail Lessee to the Port Authority for $140 million. (Blanco Aff. ¶ 2.) A "membership interest" is the method of ownership of a limited liability company under Delaware law, and thus by entering into this transaction with the Port Authority, Westfield *590 WTC Holding conveyed its ownership interest in the Retail Lessee in what was "the limited liability equivalent of an acquisition of all of the stock in an existing corporation." (Insureds' Mem. in Opp'n at 7.) As a result of the December 2003 transaction, the Port Authority became the sole owner and managing member of the Retail Lessee, which was subsequently renamed WTC Retail LLC.[5] (Blanco Aff. ¶ 3.) Under the Purchase Agreement, however, the Retail Lessee continues to exist as a separate corporate entity (albeit one controlled solely by the Port Authority instead of Westfield WTC Holding), and the Retail Lessee continues formally to pay rent to the Port Authority in accordance with the original terms of the Net Lease. (Blanco Aff. ¶¶ 4, 6-7.)

II.
The first issue on this motion is whether the December 2003 transaction constituted a sale of the World Trade Center retail lease and an assignment of the rental value loss claim after December 2003.
The Insured Parties argue that no such sale, and no such assignment, ever occurred. Relying on the actual terms of the Purchase Agreement, the Insured Parties emphasize that although the Port Authority may have acquired a controlling ownership interest in the Retail Lessee, the Retail Lessee remains in existence as a separate corporate entity and itself continues to own the Net Lease, incur retail rental value losses, and pay rent to the Port Authority. (Insureds' Mem. in Opp'n at 11-12.) As a result, the Insured Parties contend, "the instant case presents nothing more than a named insured that seeks to recover on its own policy for its own losses resulting from the continued interruption of its own business." (Id. at 15.)
The Appraising Insurers, by contrast, argue that the December 2003 transaction amounted to a buy-back of the Net Lease and an assignment of the Retail Lessee's post-2003 rental insurance claims to the Port Authority. Looking to what they say is the substance instead of the form of the transaction, the Appraising Insurers contend that the Retail Lessee "existed solely as a paper construct" (Insurers' Mem. of Law at 2) and that "in reality, substance and practice, Westfield WTC LLC had absolutely no existence separate and apart from its parent companies." (Insurers' Reply Mem. at 2.) In particular, the Insurers emphasize that the Retail Lessee had no ability to exercise any control over the single asset in its name, the Net Lease, because it had no employees, offices, or tangible property of its own. (Id. at 3, 6; Insurers' Rule 56.1 Statement ¶ 5.) Under the December 2003 transaction, the Insurers thus argue, "[a]ll the Port Authority bought was the right to control the lease. Calling the transaction the sale of a `membership interest' of an empty corporate vehicle cannot change that fundamental fact." (Insurers' Reply Mem. at 13.)
If the Insured Parties' interpretation of the December 2003 transaction is correct  that is, if the Retail Lessee continues to incur rental value losses under the Net Lease and remains insured under the terms of the relevant policies  then the Appraising Insurers' motion must be denied and no other issues even need be considered. By contrast, if the Insurers are correct, then the December 2003 transaction should be viewed as a sale of the Net Lease by Westfield WTC Holding and an attempted assignment of the post-2003 rental value loss claim from the Retail *591 Lessee to the Port Authority. In that case, the court then would have to evaluate whether the Retail Lessee could have its claim for post-2003 rental value losses assigned to the Port Authority as an already-accrued claim.
Under New York choice of law principles, the law of the state of incorporation, here Delaware, determines whether a court can disregard the corporate form under which an entity operates. Fletcher v. Atex. Inc., 68 F.3d 1451, 1456 (2d Cir.1995). Under Delaware law, a limited liability company such as the Retail Lessee is a "separate legal entity" distinct from the members who own an interest in the LLC. Del.Code Ann. tit. 6, §§ 18-201(b), -701 (2005). Delaware law, however, permits a court to pierce the corporate veil of an entity "where there is fraud or where [the entity] is in fact a mere instrumentality or alter ego of its owner." Geyer v. Ingersoll Publications Co., 621 A.2d 784, 793 (Del.Ch.1992); C.R. Bard, Inc. v. Guidant Corp., 997 F.Supp. 556, 559 (D.Del.1998).
To prevail on an alter ego claim, a plaintiff must show (i) that the parent and the subsidiary "operated as a single economic entity" and (ii) that an "overall element of injustice or unfairness ... [is] present." Harper v. Del. Valley Broadcasters, Inc., 743 F.Supp. 1076, 1085 (D.Del.1990). Under an alter ego theory, no showing of fraud is required. Id. Rather, the "injustice or unfairness" must arise from the defendant's "use of the corporate form," and may include factors such as "contravention of law or contract, public wrong, or ... equitable consideration[s]." Mobil Oil Corp. v. Linear Films. Inc., 718 F.Supp. 260, 268-69 (D.Del.1989) (warning, however, that "[t]he underlying cause of action does not supply the necessary fraud or injustice").
Beyond formally piercing the corporate veil, when evaluating the effect of a corporate transaction, courts "will look behind the form [of the transaction] to the substance [because] the term or title given by the parties to a particular transaction or agreement is not conclusive as to what it may actually be in practical operation." 15 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations, § 7042 (2004); see also Phila. Elec. Co., v. Hercules, Inc., 762 F.2d 303, 310 (3d Cir.1985) ("[B]ecause of the complex nature of corporate reorganizations and acquisitions [,] the intrinsic nature of a transaction cannot be ascertained merely from the form by which it is structured. It is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent.") (citation omitted); In re Best Products Co., 157 B.R. 222, 230 (Bankr.S.D.N.Y.1993) ("[W]hile the parties to a transaction may intend that, as between themselves, their relationship is to be governed by the labels they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement.") (citing In re PCH Assocs., 804 F.2d 193, 198 (2d Cir.1986)); Fidanque v. Am. Maracaibo Co., 92 A.2d 311, 316 (Del.Ch.1952) ("There is no magic in the words applied to the transaction."). Although courts apply this doctrine most often in the setting of corporate mergers and acquisitions, the judicial preference for substance over form applies equally to real estate transactions and the sale or lease of corporate assets. See PCH Assocs., 804 F.2d at 198; Best Products, 157 B.R. at 229-30; Bredero Vast Goed, N.V. v. Tax Comm'n, 146 A.D.2d 155, 159, 539 N.Y.S.2d 823, 825 (3d Dep't 1989); 595 Investors Ltd. P'ship v. Biderman, 140 Misc.2d 441, 531 N.Y.S.2d 714, 717-18 (N.Y.Sup.1988).
*592 In this case, the court need not accept the Appraising Insurers' implied invitation to pierce the corporate veil with respect to the former relationship between the Retail Lessee and its Westfield parents, mainly because those Insurers do not actually seek to hold the Westfield entities liable for any action taken by the Retail Lessee. This conclusion, however, does not prevent the court from recognizing the December 2003 transaction for what it was: a transfer of the Net Lease from Westfield WTC Holding to the Port Authority and an assignment of the Retail Lessee's post-2003 rental value loss claim. The evidence shows that besides its ownership of the Net Lease, the Retail Lessee has had little independent reason for its existence, lacking any employees, offices, or tangible property of its own to manage either before or after the December 2003 transaction. (See Insurers' Rule 56.1 Statement ¶¶ 5-8; Insurers' Rule 56.1 Supplemental Statement ¶¶ 2-9.) Although the Retail Lessee does indeed continue to exist as an ostensibly separate corporate entity, the reality is that the Retail Lessee is now wholly owned and controlled by another entity, the Port Authority, as it was when it was owned and managed by Westfield WTC Holding. That the Retail Lessee still may be paying rent to the Port Authority is irrelevant: Because the Port Authority is the sole owner and managing member of the Retail Lessee, the Port Authority essentially is paying rent to itself. (Insurers' Reply Mem. at 12.) The Retail Lessee, in other words, has simply gone from being the passive "ownership vehicle" of Westfield America and its subsidiaries (Insurers' Rule 56.1 Statement Ex. E at 13) to being the passive "ownership vehicle" of the Port Authority.
Because the Retail Lessee was of no other use to the Port Authority, the only visible purpose of the December 2003 transaction was to transfer ownership of the Net Lease, not ownership of the Retail Lessee. As the Appraising Insurers contend, "[b]y buying back control over the World Trade Center's retail space, the Port Authority freed itself from any need to negotiate with or otherwise take into consideration the wishes of the Retail Lessee as it contemplates the options for construction of any new World Trade Center." (Insurers' Reply Mem. at 12.) This rationale is implicitly confirmed by the terms of the Purchase Agreement. (See Blanco Aff. Ex. A ¶ K (stating expectation of parties that sale of membership interest in Retail Lessee "will help simplify and expedite the redevelopment process").) Because selling the Retail Lessee, a corporate vehicle with no other assets, was the functional equivalent of selling the retail leasehold itself, this court need not pierce the corporate veil between the current Port Authority-Retail Lessee relationship to find that the Port Authority is now the real party in interest with respect to the WTC retail leasehold.
Likewise, the December 2003 transaction operated as an assignment of the Retail Lessee's insurance claim for rental value losses incurred after 2003. Although the Purchase Agreement provided that the Retail Lessee would retain all "right, title and interest" in the proceeds of the rental insurance policies (id. § 1.1), because the Retail Lessee is now wholly owned and managed by the Port Authority, it is the Port Authority that effectively will receive any proceeds granted under the relevant policies for post-2003 losses. Regardless of the form whereby the December 2003 transaction was structured, the substance of the Purchase Agreement included a de facto assignment of the underlying rental insurance policies at issue here. See Greco v. Or. Mut. Fire Ins. Co., 191 Cal.App.2d 674, 12 Cal.Rptr. 802, 807 *593 (1961) (assignment of accrued right to insurance proceeds may be expressed orally, in writing, or "may be the product of inference"; courts will imply an assignment when consistent with parties' intent because "substance and not form controls"). The December 2003 transaction was, in substance even if not in form, a sale of the World Trade Center retail lease, and as such, it constituted an assignment of the Retail Lessee's rental value loss claim after December 2003.

III.
The second issue raised by the Appraising Insurers' motion for partial summary judgment is whether the Retail Lessee's rental insurance claim for losses incurred after December 2003 was validly assigned to the Port Authority as an already-accrued claim for damages. As is standard with property damage and business interruption insurance policies, the policy language effective here barred assignment of the relevant policies without the Insurers' consent. (See Insurers' Rule 56.1 Statement ¶ 13 ("The insured's rights and duties under this policy may not be transferred without the written consent of the Company....").) Under such provisions, any unauthorized assignment of a property insurance policy before a loss occurs is invalid. See, e.g., Travelers Indemn. Co. v. Israel, 354 F.2d 488, 490 (2d Cir.1965); Carle Place Plaza Corp. v. Excelsior Ins. Co., 144 A.D.2d 517, 518, 534 N.Y.S.2d 397, 398 (2d Dep't 1988). After a loss occurs, however, a party to an insurance contract may assign its right to accrued insurance proceeds to another party, even in the face of express policy language prohibiting assignments. See, e.g., Travelers, 354 F.2d at 490; Ardon Constr. Corp. v. Firemen's Ins. Co., 16 Misc.2d 483, 185 N.Y.S.2d 723, 729 (1959).
The rationale for distinguishing pre-loss assignments from post-loss assignments centers on the contrasting nature and extent of the risks imposed on insurers in each context. As the Court explained in Beck-Brown Realty Co. v. Liberty Bell Ins. Co., 137 Misc. 263, 241 N.Y.S. 727 (1930):
Before loss, the insurer is subjected to a risk, and it is this risk which the insurer may exempt from assignability except upon its own consent. Upon loss, however, the risk disappears and nothing remains except the assured's right to payment  a mere chose in action which may be assigned within the limitations of any other chose in action.
Id. at 728; see also Globecon Group, LLC v. Hartford Fire Ins. Co., No. 03 Civ. 0023, 2004 WL 1574692, at *8 (S.D.N.Y. July 13, 2004) ("`No assignment' clauses protect against... unforeseen risk. When the loss occurs before the transfer, however, the characteristics of the [assignee] are of little importance: regardless of any transfer[,] the insurer still covers only the risk it evaluated when it wrote the policy.") (quoting Northern Ins. Co. v. Allied Mut. Ins. Co., 955 F.2d 1353, 1358 (9th Cir.1992)); Mellen v. Hamilton Fire Ins. Co., 17 N.Y. 609, 615 (1858) (post-loss assignment of accrued insurance claim "no more than an assignment of a debt"); 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 35:7 (3d ed. 2004) ("[A]ssignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim.").
There are, however, limits to the kinds of post-loss claims that can be assigned, particularly when they involve business interruption coverage. In so arguing, the Appraising Insurers rely primarily on two cases: Holt v. Fidelity Phoenix Fire Ins. Co., 273 A.D. 166, 76 N.Y.S.2d 398 (3d *594 Dep't 1948), and Bronx Entertainment, LLC v. St. Paul's Mercury Ins. Co., 265 F.Supp.2d 359 (S.D.N.Y.2003). In Holt, a movie theater owned by an insured party, the William Berinstein Enterprises, was destroyed by a fire. Ten days later, the theater owner sold the property and assigned its business interruption insurance policy to an individual named Holt. After the insurance company denied the assignee's claim for post-sale business interruption losses, Holt sued. The Court rejected Holt's attempt to collect on the policy:
The obligation under the rider in question was to reimburse the William Berinstein Enterprises for the loss which it sustained, arising by reason of its loss of profits, etc., because of interruption of its business to be measured by its business experience before the loss and of its probable experience thereafter. The plaintiff [Holt] was no party to this policy and any assignment to him was void.
Holt, 273 A.D. at 168, 76 N.Y.S.2d at 399.
The Court, however, explicitly distinguished the situation presented by Holt's claim from two other situations in which insurance claims could be assigned validly, stating that "[t]he plaintiff is proceeding on the theory that once the fire occurred a claim accrued, which could be assigned. That is, of course, true under a straight fire policy, and is probably true under a rent insurance policy." Id. (emphasis added). Had Berinstein Enterprises not already been paid for its own losses resulting from the fire, it would have had "an accrued claim for its loss which could have been assigned" to the plaintiff, Holt. Id. The Court concluded, however, that
[n]o claim or cause of action for the plaintiff's loss accrued at the time of the fire. That loss was in effect established, if at all, by the assignment. What this action amounts to is an attempt by a stranger to a policy of insurance to collect for loss of profits, etc., arising out of a business which had not come into existence until eleven days after the fire, and after the named insured, to whom the defendant had issued its policy had ceased to operate the business covered and had transferred the title, ownership and control of the premises to the plaintiff.
Id. at 168, 76 N.Y.S.2d at 400 (emphasis added). The Court, therefore, rejected the assignee's claim.
In Bronx Entertainment, Judge Conner faced facts nearly identical to those in Holt: an insured party suffered losses at its business facility (this time, storm damage to a golf driving range), made insurance claims for its own losses, and then sold the business and assigned its insurance policy to a third party. After noting that "[i]t is clear law that an assignee steps into the shoes of the assignor and gains only that to which the assignor is entitled," Bronx Entm't, 265 F.Supp.2d at 361, the Court applied Holt:
Likewise, in the instant case, plaintiff is seeking to collect business interruption damages arising out of a business which did not come into existence until 17 days after the wind damage, and after Family Golf, the named insured, to whom defendant had issued its policy had ceased to operate the business covered and had transferred the title, ownership and control of the premises to plaintiff. Therefore, plaintiff cannot assert a claim for losses it suffered.
Id. at 362-63. As in Holt, the Court agreed that "[o]f course plaintiff may maintain an action for Family Golf's losses that accrued as of the date of the assignment." Id. at 363 (emphasis added). By contrast, the Court stated, "plaintiff is proceeding on the theory that it is also entitled to those business losses which had yet to occur at the time of the assignment. *595 This plaintiff cannot do because it would, in effect amount to an assignment of the entire policy to which defendant did not consent." Id. (emphasis added). The Court thus concluded that the original owner could not assign a claim for post-sale business interruption coverage to the new owner.
The dispute between the parties in the instant case essentially boils down to whether the post-sale rental value losses at issue here were "accrued" or instead had "yet to occur" as of the time of the assignment in December 2003. See Bronx Entm't, 265 F.Supp.2d at 363. The Appraising Insurers contend that the facts in this case require the court simply to apply Holt and Bronx Entertainment and find that any attempted assignment to the Port Authority of the Retail Lessee's post-sale rental value losses was invalid. Relying on a distinction between "insurance coverage for property damage and coverage for business income losses," the Insurers note that a claim for fire insurance proceeds is "already accrued, and not dependent on any contingencies" once the fire occurs. (Insurers' Reply Mem. at 13-14.) By contrast, the Insurers argue, the rental value loss claimed here was "not a single discreet [sic] loss that had accrued" by the time of sale, but rather was "an ongoing loss, incurred month by month" as the Retail Lessee failed to receive rental payments from its tenants after the September 11th attacks. (Id. at 13.) Although Westfield WTC Holding could have assigned the proceeds for pre-December 2003 losses to the Port Authority, the Insurers maintain, when Westfield WTC Holding sold its membership interest in the Retail Lessee in December 2003, the Retail Lessee simply had no post-2003 losses of its own to assign. (See id. at 16.)
The Insured Parties reject the Insurers' reliance on Holt and Bronx Entertainment, arguing that both cases involved "attempted assignments of uncertain future business profits, not certain anticipated rent payments." (Insureds' Mem. in Opp'n at 18.) Seizing instead on the dictum in Holt that a rental insurance claim "probably" is accrued upon the occurrence of an insurable event, Holt, 273 A.D. at 168, 76 N.Y.S.2d at 399, the Insured Parties contend that there are "fundamental differences between business interruption claims for uncertain lost profit (which may not be assignable) and fixed claims for lost rent (which are clearly assignable)." (Insureds' Mem. in Opp'n at 16.) In so arguing, the Insured Parties maintain that "an insured is allowed to assign an insurance claim when the loss has occurred and can be measured" and that in this case, the claim was "fully liquidated" after the September 11th attacks and remains "ascertainable and measurable today." (Id. at 2-3.)
The most direct way to resolve this dispute would, of course, be to apply other precedents determining whether a rental insurance claim is "accrued" at the time of an insurable event and is thus assignable post-loss. Unfortunately, neither this court's own research nor the parties' memoranda have yielded any other cases addressing specifically whether a rental value loss claim accrues immediately (like the property damage caused by a fire) or is instead incurred month by month when the insured party fails to receive rental payments from its tenants (as with the claims for lost business profits in Holt and Bronx Entertainment). On the one hand, the Appraising Insurers make an intuitively appealing argument that rental value insurance is analogous to business interruption insurance and should be treated similarly because each protects a stream of future income that would have been received had the insured business continued in operation. Nevertheless, it is notable *596 that the Court in Holt suggested the opposite conclusion, surmising that a claim under a rental insurance policy "probably" is analogous to a claim under a "straight fire policy," which accrues immediately and is assignable post-loss. Holt, 273 A.D. at 168, 76 N.Y.S.2d at 399.
Absent direct precedent, it is useful to examine first principles that appear to underlie the cases that are available. It appears from Holt, Bronx Entertainment, and Globecon Group, LLC v. Hartford Fire Ins. Co., No. 03 Civ. 0023, 2004 WL 1574692 (S.D.N.Y. July 13, 2004), that courts addressing whether post-loss assignments of insurance claims will be recognized rely on (i) the characteristics of the assignee (i.e., who the policy is transferred to, as well as their conduct), and (ii) the nature of the claim (i.e., whether it is fixed and measurable, as opposed to speculative and contingent). Both factors illuminate whether the risk imposed on an insurer by the assignment of a claim is meaningfully different from that borne by the insurer before such assignment.
In Globecon, Judge Buchwald surveyed the law of post-loss assignments as she weighed the assignment of another September 11th-related business interruption claim. After acknowledging that New York courts have disallowed post-loss assignments of health insurance policies, Globecon, 2004 WL 1574692, at *8-9, she restated the "majority rule," which recognizes that "ordinary post-loss assignments, where the amount of loss is fixed or easily ascertained, do not expose insurers to an additional risk and [therefore] upholding contract language forbidding such assignments in such a context serves no policy end and potentially provides the insurer a windfall." Id. at *9 (emphasis added). Regarding the assignment at issue in Globecon, however, the Court determined that the "characteristics of the [assignee]" were particularly "salient" because the assignee "did not inherit a perfected claim" from the assignor and lacked the information needed to prove the claim independently. Id. at *9-10. Because upholding assignment of the claim would have required the insurance company "to seek verification of the claim from [the assignee], a third-party to the Policy with, at best, second-hand information" about the assignor's losses, the Court concluded that the attempted assignment was "ineffective." Id. at *10-11.
The outcomes in Globecon, Holt, and Bronx Entertainment demonstrate courts' focus on the risks imposed on insurers both before and after an assignment. Holt and Bronx Entertainment, for example, reflect the concern that post-loss assignment of a business interruption policy would unduly increase the risk borne by an insurer by allowing a new owner operating a new business nevertheless to seek coverage for its own lost profits as if it initially had been covered by the original insurance policy. See Holt, 273 A.D. at 168, 76 N.Y.S.2d at 400 (assignee's claim was "an attempt by a stranger to a policy of insurance to collect for loss of profits, etc., arising out of a business which had not come into existence until eleven days after the fire"); Bronx Entm't, 265 F.Supp.2d at 363 (assignee could not claim post-assignment losses because that "would, in effect amount to an assignment of the entire policy to which [the insurer] did not consent"). Globecon, meanwhile, focused more on the characteristics and conduct of the assignee, particularly the assignee's inability to "adequately fulfill the obligations of presenting and proving a claim," which in turn affected the insurer's ability to process that claim. See Globecon, 2004 WL 1574692, at *10-11.
In contrast to these business interruption cases, the amount of the loss under a *597 rental insurance claim is largely "fixed or easily ascertained" in advance of the assignment. See Globecon, 2004 WL 1574692, at *9. Whereas business profits inherently require speculation about future earnings and can be subject to many contingent market events, retail rental payments typically are more certain and measurable. As a general rule, such retail rents are fixed by existing leases, with quantifiable payments due from tenants on a monthly basis. Indeed, although the Appraising Insurers reject any contention here that the WTC retail rental value loss accrued immediately on September 11th, they do concede that "[t]he total amount of loss that would be incurred over the years of reconstruction could be projected and estimated, based on a variety of factors and assumptions." (See Insurers' Reply Mem. at 13.)
Moreover, because these retail leases were in place before the assignment of the rental value loss claim in December 2003, the risk borne by the Insurers is not altered by either the conduct or the characteristics of the assignee. In Holt and Bronx Entertainment, the post-assignment losses claimed by the assignees were the losses of a new business that was not previously in existence, and the courts' decisions in each case underscored the difficulties of valuing what the new business would earn were it actually in operation. In this case, by contrast, the fact that the Port Authority is now the effective holder of the retail leasehold does not change the actual amount of the rental proceeds due; it changes only the recipient of those proceeds. The Insurers remain obligated to pay the same lost rents under the leases already in existence on September 11th  "fixed or easily ascertained" payments that the Insurers would have been prepared otherwise to make to the Retail Lessee if the retail leasehold had not been conveyed to the Port Authority.
In Globecon, the Court recognized that in the majority of cases, "upholding contract language forbidding [post-loss] assignments ... serves no policy end and potentially provides the insurer a windfall." Globecon, 2004 WL 1574692, at *9. In this case, the Insurers contracted to provide coverage for, inter alia, the "total anticipated rental income" lost due to the suspension of the insured's operations during the period of restoration. (Insurers' Rule 56.1 Statement Ex. M § A.2 (emphasis added).) Under such terms, the Retail Lessee was guaranteed to receive retail rents for the remaining life of the leases in place on September 11th (a fixed stream of income more certain and measurable than future business profits), and the Insurers calculated the risks of providing coverage for such rental payments based on the expectation that the Retail Lessee would incur losses throughout the period of restoration. To allow the Insurers to escape their obligation to pay on those policies, even though the risk they face has not been increased by the assignment of the rental insurance claim to the Port Authority, would create a windfall for the Insurers equal to the post-2003 rental value losses that would go unpaid under the policies. As the courts have emphasized, "no-assignment clauses are designed to protect insurers from unforeseen increases in risk," Texaco A/S, S.A., v. Commercial Ins. Co., No. 90 Civ. 2722, 1995 WL 628997, at *6 (S.D.N.Y. Oct. 26, 1995), vacated on other grounds, 160 F.3d 124 (2d Cir.1998), but "where the assignment is made ... when the risks have ended ... it is in reality no more than an assignment of a debt, which ... it would be unreasonable to suppose was meant to be prohibited." Mellen v. Hamilton Fire Ins. Co., 17 N.Y. 609, 615 (1858). I see no good reason why the December 2003 conveyance of the retail leasehold interest to the Port Authority *598 should allow the Insurers to avoid such payments. Cf. Bronx Entm't, 265 F.Supp.2d at 363 (despite denial of assignee's claim, no windfall received by insurer where expected post-assignment losses were factored into purchase price of damaged premises); Globecon, 2004 WL 1574692, at *11 n. 20 (no windfall to insurer where assignee had not perfected and could not prove its claim).
There are limits, however, to what rental value losses can be considered accrued as of the time of the December 2003 assignment. In their reply memorandum, the Appraising Insurers argue that several potential contingencies undermine the certainty of the claim for future loss of retail rents:
The ultimate measure of the losses depended on a number of factors, including: changes in the commercial real estate market that would occur over the years of rebuilding; the likelihood that companies renting retail space in September 2001 would renew their leases as they expired; the amount those companies would be willing to pay in rent when and if they renewed their leases; the difficulty and expense involved in attracting new companies to fill open storefronts; and the rents those companies would be willing to pay.
Each of those factors is heavily affected by one overarching consideration: Who manages the retail space. When it still controlled the retail space, Westfield argued that it would have generated higher rents because of its experience and expertise in operating shopping malls. The Port Authority does not have that same experience or expertise. Its use or management of this asset  the net retail leasehold  would be different than Westfield's, and the business losses it would incur during the rebuilding process would, likewise, be different. The non-assignment clause in the insurance policy prevents this kind of change in the insured risk unless and until the insurance companies consent to it.
(Insurers' Reply Mem. at 14.)
Although the Appraising Insurers helpfully underscore some of the more contingent elements of the rental value loss claim at issue, they overstate their case: Not all estimation entails speculation, and it is common lore, if not law, that the principal factor determining the value of real estate is its location  hence the real estate mantra, "location, location, location," not "management, management, management." Particularly when evaluating a high-traffic site such as the World Trade Center, the burden should rest on the Insurers to show that a change in management from the Westfield entities to the Port Authority would have affected the retail rents that could have been obtained from the WTC retail leasehold absent the events of September 11, 2001. Without such proof, the retail rents to be derived from the expected renewal of lapsed leases and the filling of vacant storefronts are presumptively includable in the rental value loss award to be calculated by the Appraisal Panel.
However, if the Insurers successfully meet their burden, or the conditions listed below are met, the Appraisal Panel is directed to deduct the following non-assignable elements of the rental value loss claim from the ultimate award to be granted in this case:
(i) The renewal of leases that would have lapsed during the theoretical period of restoration for the retail space, if the Appraisal Panel finds that it is more likely than not that a particular retail lease would not have been renewed, regardless of whether the Westfield entities or the Port Authority *599 was managing the retail space;[6]
(ii) Any expected rental income to be derived from attracting new tenants to fill storefronts that were vacant on September 11th, if the Appraisal Panel finds that it is more likely than not that a particular storefront would not have been filled, regardless of whether the Westfield entities or the Port Authority was managing the retail space;
(iii) Any expected increase in rents that would have been attributable directly to the Westfield entities' management of the retail space,[7] including the replacement of September 11th tenants with new higher-paying tenants; and
(iv) Any rental value losses that extend beyond the theoretical period of restoration for the retail space, as determined by the Appraisal Panel.[8]
This outcome is designed to provide insurance coverage for the retail rental value loss arising out of past events (i.e., the assignment of loss), while denying coverage for those aspects of the claim that are contingent on uncertain future events or the characteristics of the assignee (i.e., the assignment of risk). Such a result, moreover, addresses the ambiguity created by Holt's dictum that rental insurance proceeds "probably" are accrued upon an insurable event, Holt, 273 A.D. at 168, 76 N.Y.S.2d at 399, and also reflects Judge Buchwald's observation in Globecon that determining coverage for lost business income "generally requires a more complex calculation than many other types of insurance coverage." Globecon, 2004 WL 1574692, at *9. Thus, the court denies the Appraising Insurers' motion for partial summary judgment, subject to the qualifications listed above.

* * * * * *
For the reasons and to the extent stated above, the Appraising Insurers' motion for partial summary judgment is denied.
SO ORDERED.
NOTES
[1] The Appraising Insurers, also referred to herein as the "Insurers," are Allianz Insurance Company, Travelers Indemnity Company, Gulf Insurance Company, Industrial Risk Insurers, and Royal Indemnity Company.
[2] For purposes of this opinion, the Insured Parties consist of Westfield WTC LLC, now renamed WTC Retail LLC; Westfield Corporation, Inc.; Westfield America, Inc.; and the Port Authority. (See Defs.' Mem. in Opp'n to Appraising Insurers' Mot. for Partial Summ. J. that WTC Retail Rental Value Loss Ends Dec. 30, 2003, at 5 (Insureds' Mem. in Opp'n); Insureds' Rule 56.1 Statement in Opp'n ¶ 2.)
[3] Both sides have agreed to rely on the policy language found in the Travelers business income coverage form. (See Insurers' Mem. of Law at 5 n. 7; Insureds' Rule 56.1 Statement in Opp'n ¶ 14.)
[4] Although the Purchase Agreement is dated December 1, 2003, because the Agreement expressly allocated the rental insurance proceeds received through December 31, 2003 as "Previous Distributions," it is the latter date that serves as the appropriate cut-off date for the Appraising Insurers' motion here. (See Blanco Aff. Ex. A § 7.1(a).)
[5] Both sides appear to agree that the Retail Lessee's name change is of no legal significance here. (See Insureds' Mem. in Opp'n at 2 n. 1.)
[6] Cf. Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 279 F.Supp.2d 235, 239 (S.D.N.Y.2003) (where policy directed that "due consideration" be given to insured party's pre-loss experience as well as its "probable experience thereafter had no loss occurred," requiring proof that insured's lease "would likely have been renewed absent the events of September 11, 2001").
[7] Conversely, any expected increase in rents not attributable directly to the Westfield entities' management of the retail space (i.e., those increased payments that would have been made during the period of restoration regardless of whether the Westfield entities or the Port Authority was managing the retail space) would be includable in the rental value loss award.
[8] The theoretical period of restoration for the retail space may be shorter than the period of actual rebuilding and may even be shorter than the theoretical period of restoration for the entire World Trade Center complex. See Duane Reade, 279 F.Supp.2d at 239 (describing as "untenable" the contention that the restoration period for an insured retail store "must be coterminous with the time actually required to rebuild the entire complex that will replace the World Trade Center"); see also SR Int'l Bus. Ins. Co v. World Trade Ctr. Props., LLC, No. 01 Civ. 9291, 2005 WL 827074, at *3-9 (S.D.N.Y. Feb. 15, 2005) (applying theoretical measure to determine period of restoration).